**No. 25-5177 (L), 25-5179, 25-5220, 25-5221, 25-5223, 25-5224, 25-5226**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

NOVARTIS PHARMACEUTICALS CORPORATION, et al.,

*Plaintiffs-Appellants-Cross-Appellees*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, et al.,

*Defendants-Appellees-Cross-Appellants*,

340B HEALTH, et al.,

*Intervenors-Defendants-Appellees-Cross-Appellants*.

_____

On Appeal From the U.S. District Court for the District of Columbia
Nos. 21-cv-2608, 24-cv-3220, 24-cv-3337, 25-cv-117
District Judge Dabney L. Friedrich

_____

## REVISED BRIEF OF COMMUNITY ONCOLOGY ALLIANCE, INC. AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS NOVARTIS PHARMACEUTICALS CORPORATION AND BRISTOL MYERS SQUIBB COMPANY

**FRIER & LEVITT, LLC**

Matthew J. Modafferi, Esq.
Jonathan E. Levitt, Esq.
84 Bloomfield Avenue
Pine Brook, NJ  07058
(973) 618-1660
mmodafferi@frierlevitt.com
jlevitt@frierlevitt.com

Dated: July 7, 2025

## <u>F.R.A.P. 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Amicus Community Oncology Alliance, Inc. (COA) is a non-profit 501(c)(6) organization. It has no parent corporation, and there is no publicly held corporation that owns 10% or more of COA's stock.

# Table of Contents

STATEMENT OF IDENTITY AND INTEREST OF THE *AMICUS* ......................1

SUMMARY OF ARGUMENT ................................................................5

FACTUAL SUMMARY .......................................................................8

  A.  The 340B Program was Created to Benefit America's Most Vulnerable Patients and the 340B Providers that Serve Them..................................8

  B.  The Pharmacy Benefit Manager Landscape..................................10

  C.  The Exponential Growth of Contract Pharmacies Has Caused Further Reliance on PBMs ......................................................................11

  D.  The High Cost of Paying off Vertical Integration and the Resulting Harm to Low-Income Patients and Independent Community Practices............................14

ARGUMENTS .................................................................................16

  A.  The Lack of Regulation Regarding the Exponential Growth of Contract Pharmacies Has Allowed PBMs to Siphon the 340B Profits Intended for Charity Care ........................................................................................16

  1.  PBM-Affiliated Pharmacies Comprise a Disproportionate Share of Contract Pharmacies and Retain Billions in 340B Discounts Annually' ............................18

  2.  PBMs and Contract Pharmacies Have Indicated that Reductions to Their 340B Contract Pharmacy Footprint Would Significantly and Materially Affect Overall Profitability ...................................................................21

  B.  The Profit Opportunities Presented by 340B and Contract Pharmacies Have Incentivized PBMs to Drive Out Unaffiliated Providers to the Detriment of Patients........................................................................................22

  C.  PBMs Exploit the Lack of Transparent Data about 340B Claims to Obtain Illegal Double Discounts on Already-Discounted 340B Drugs ..........................24

  D.  The Cash Rebate Model Improves Upon the Status Quo Through Greater Transparency...............................................................................26

CONCLUSION ................................................................................28

# Table of Authorities

**Statutes**

42 U.S.C. § 256b ................................................................................. 2, 8, 25

**Other Authorities**

75 Fed. Reg. 10,272 ...............................................................................9
61 Fed. Reg. 43,551 ............................................................................8, 9

**Rules**

Fed. R. App. P. 29(a)(4) .........................................................................1

## STATEMENT OF IDENTITY AND INTEREST OF THE *AMICUS*[1]

Pursuant to Fed. R. App. P. 29,[2] amicus Community Oncology Alliance, Inc. ("COA") submits this brief in support of Plaintiffs-Appellants Novartis Pharmaceuticals Corporation ("Novartis") and Bristol Myers Squibb Company ("BMS").[3] Amicus COA is a non-profit organization dedicated to representing and advocating for community oncology practices and, most importantly, the cancer patients they serve. For over twenty years, COA has built a national network of independent (physician run; not hospital owned) community oncology practices to provide the highest quality, most affordable cancer care close to home.

A growing component of cancer treatment is utilizing the increasing availability of oral drugs—in effect, "chemotherapy in a pill"—to treat cancer patients. Community oncology practices operate in-office pharmacies or drug dispensing facilities—depending on what state pharmacy regulations allow—through which oral cancer drugs are dispensed directly to patients.

---

[1] This amicus brief was initially timely filed on June 25, 2025. It is being re-filed pursuant to the Court's direction to revise the font size used for footnotes. The text and substance of the brief remains unchanged from the June 25, 2025 version.

[2] Counsel for Appellants and Appellees consent to the filing of this amicus brief. COA states that no party or its counsel authored this brief in whole or in part. COA further states that no person or party contributed money intended to fund the filing of this brief. COA states that it has no parent company and that no publicly held company has a 10% or greater ownership interest in COA.

[3] Although COA is submitting this amicus brief specifically in Novartis' and BMS' appeals, COA's arguments and position set forth in this amicus brief apply equally to all consolidated matters on appeal.

1

Community oncology practices must routinely interact and deal with pharmacy benefit managers ("PBMs") that, among other tasks, process and adjudicate insurance claims for oral cancer drugs. The three largest PBMs— CVS/Caremark ("Caremark"), Cigna/Express Scripts ("ESI"), and UnitedHealth/OptumRx ("OptumRx")—control 80 percent of the prescription drug market and consequently have enormous leverage with all pharmacy providers. In addition, the largest PBMs own, or are affiliated with retail pharmacy chains, specialty pharmacies, and mail order pharmacies.

A significant and growing source of the major PBMs' profitability and market dominance is the PBMs' infiltration of the 340B Drug Pricing Program ("340B"), the subject of the present appeal. 340B is a federal program that provides certain hospitals and other designated grantees, including community health centers designated as "covered entities"[4], with substantial discounts on drugs from pharmaceutical companies as a requirement of their participation in Medicaid and Medicare Part B. The original congressional intent of creating 340B in 1992 was to, in essence, help fewer than 100 safety net hospitals provide free or discounted medical care to patients in need. However, the program has grown substantially such

---

[4] *See* 42 U.S.C. § 256b(a)(4) (defining "covered entity").

that it accounted for $124 billion of prescription drugs (priced at wholesale acquisition cost) in 2023 and is now the second largest federal drug program.[5]

Because many 340B covered entities, such as small community health centers, do not have in-house pharmacies, they contract with external "contract pharmacies" that dispense 340B drugs on behalf of the covered entities to 340B-eligible patients. In recent years there has been a proliferation of contract pharmacies, driven in part by the increasing participation of PBMs in 340B by having their wholly-owned or affiliated pharmacies designated as contract pharmacies ("PBM-affiliated contract pharmacies"). An analysis by Avalere Health found that sixty-nine percent (69%) of contract pharmacies were associated with a PBM through vertical integration (53%) or contractual arrangement (16%).[6] In contrast, only sixteen percent (16%) of non-340B pharmacies were vertically integrated or affiliated with a PBM.[7] The rise of PBM-affiliated contract pharmacies within 340B have allowed some of the largest for-profit corporations to siphon billions of dollars from the 340B program that should be going to the benefit of indigent and underserved patients.

---

[5] Rory Martin and Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023*, https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2024/iqvia-update-on-size-of-340b-program-report-2024.pdf (last accessed June 20, 2025).

[6] Avalere, *PBM, Mail-Order, and Specialty Pharmacy Involvement in 340B*, https://avalere.com/insights/pbm-mail-order-and-specialty-pharmacy-involvement-in-340b (last accessed June 20, 2025).

[7] *Id.*

Not only are patients in need not getting discounts to help pay for expensive drugs, but also the mutation of 340B is putting tremendous pressures on community oncology practices. These include 340B hospitals cutting off patient referrals to community oncology providers in order to pressure practices to merge into hospitals in order to capture more 340B discounts, as well as PBMs mandating that cancer patients use their wholly-owned contract pharmacies so that PBMs can optimize their 340B profits. This crowding out of community oncology practices also impacts patient care. Cancer patients who are treated in hospitals pay more out-of-pocket costs. Patients forced to use PBM mail-order pharmacies face treatment delays, coverage denials, as well as higher costs.

The root of the problems described above is the lack of transparency in the 340B program. COA reads nothing in the statute that requires pharmaceutical manufacturers to use the "product replenishment model," which requires manufacturers to give covered entities access to front-end 340B discounts without first verifying 340B eligible patients and claims, rather than back-end rebates based on transparent data (referred by Novartis and BMS as the "cash rebate model"). COA implores this Court to recognize that hospitals and PBMs have essentially created a for-profit sub-market facilitated by an almost total lack of transparency surrounding 340B. This is precisely the reason those actors are fighting the use of rebates so intensely. COA believes that a reasoned shift from front-end, non-transparent

4

discounts to back-end, data-driven rebates will cast the searchlight inward on 340B and its abuses and better guarantee that the program is serving patients, not large for-profit corporations. The underlying issue in this litigation is drug profits versus patient well-being. That is why COA is filing this amicus brief and respectfully asks the Court to allow pharmaceutical manufacturers to adopt the 340B "cash rebate" model.

## SUMMARY OF ARGUMENT

Congress established 340B in 1992 with the goal of making health care affordable and accessible at certain designated safety-net providers serving uninsured, low-income, or otherwise vulnerable patients. Congress created 340B because voluntary discounts provided to safety-net providers were eliminated when, in 1990, Congress required that manufacturers provide their "best price" for drugs to Medicaid as a mandatory part of participation in Medicaid.

However, over the last two decades, extreme consolidation and vertical integration—combined with flawed government guidance and lax oversight—have allowed the largest insurers and PBMs, through their owned or affiliated ("vertically integrated") contract pharmacies, to increasingly dominate (and reap substantial profits from) the 340B program. PBMs retain much of the profits they generate through the 340B program, which are not passed on to covered entities or their patients. Making matters worse, the enormous revenue these for-profit entities retain

through 340B empowers PBMs to further consolidate their control over, and to monopolize, the broader pharmacy market, which increases prices and drives independent pharmacies out of business.

The number of vertically integrated Contract Pharmacies participating in 340B, and the number of arrangements these for-profit pharmacies have with 340B providers has grown exponentially. In conjunction with the rise of PBM-affiliated Contract Pharmacies, the complexity of administering 340B drugs has led most 340B providers and Contract Pharmacies to rely on dedicated 340B Third-Party Administrators ("TPAs") to retroactively determine which claims are 340B-eligible and to coordinate the replenishment of inventory using drugs purchased under the 340B program. Moreover, PBMs have positioned themselves, particularly over the last five to ten years, as the owners of the majority of Contract Pharmacies, while some of the largest TPAs are also owned or affiliated with the PBMs.

The PBMs do not just profit from the 340B program through their dispensing and TPA practices, but also in their role as traditional PBMs, managing pharmacy benefits on behalf of plan sponsors, such as health insurance companies, unions, self-funded employers and government programs, and negotiating rebates from pharmaceutical manufacturers. In this role, the PBMs retain further profits from the 340B program by concealing data from manufacturers that would indicate which claims had been dispensed using inventory purchased under the 340B program,

6

thereby enabling PBMs to obtain rebates on the 340B claims, which are otherwise supposed to be exempt from such rebates per manufacturers' contracts with PBMs. Thus, pharmaceutical manufacturers frequently pay "duplicate discounts" on 340B drugs that were sold to 340B providers at a steep discount.

These PBM tactics inevitably place upward pressures on drug prices because pharmaceutical manufacturers increase their drug prices to compensate for PBM rebates and improper double discounts. Additionally, PBMs have no incentive to negotiate lower drug prices as their profits from the 340B program, especially from their 340B contract pharmacies, are linked to the price of the drug. Therefore, patients incur higher out-of-pocket costs for drugs.

Today's 340B program has diverged significantly from the one Congress originally legislated, especially driven by the explosion of contract pharmacies and the entry of PBMs into 340B. Providing up-front discounts when 340B was first implemented was appropriate because the program was small and uncomplicated. However, with the explosion of contract pharmacies, and the increasing foothold of PBMs capturing 340B discounts, the program has become a complicated, veritable black hole that has mutated from its original congressional intent and implementation. Up-front discounts are virtually unaccountable as to whether the discounts are actually helping patients in need and how much of the discounts make it to the hands of 340B providers. By utilizing 340B rebates, rather than discounts,

pharmaceutical manufacturers will be better able to ensure that 340B savings are being directed to patients.

## FACTUAL SUMMARY

### A. The 340B Program was Created to Benefit America's Most Vulnerable Patients and the 340B Providers that Serve Them

Congress designed 340B to assist certain healthcare facilities serving poor, uninsured or otherwise vulnerable populations. *See* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602 (codified as amended at 42 U.S.C. § 256(b). Under 340B, drug manufacturers—as a requirement to participate in Medicaid—are required to charge hospitals and other 340B providers no more than a significantly discounted "ceiling price" on certain outpatient prescription drugs purchased by these entities for their patients. 42 U.S.C. § 256b(a)(1), (4). 340B's purpose is "to enable covered entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2 at 12 (1992). A fundamental aim of 340B is supporting the 340B providers' ability to "provide direct clinical care to large numbers of uninsured Americans" regardless of their ability to pay. *See id.* Indeed, HRSA, the agency charged with administering 340B, has opined that 340B is designed so that 340B providers would "pass all or significant part of the discount to their patients." HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43,551 (Aug. 23, 1996). Thus, the clear purpose

8

of 340B is that uninsured, poor, and otherwise vulnerable patients would benefit by receiving discounted drugs or charity care. Congress did not intend 340B discounts to become a financial windfall for PBMs or hospitals.

Under 340B, eligible 340B providers can acquire drugs from manufacturers at extreme discounts from the usual price. In turn, *and in __theory__*, 340B providers can "pass on" those savings to their patients through lower costs for medications, or, as contemplated by 340B itself, 340B providers can seek reimbursement for 340B drugs in the normal course and use those greater profit margins to subsidize other unfunded areas of their operations (note, most 340B providers are safety net providers, mandated by law or regulation to take on a disproportionate amount of uninsured or indigent patients). Because certain 340B providers, such as small community health centers, may not have in-house pharmacies, HRSA issued sub-regulatory guidance in 1996 permitting 340B providers to "contract" with outside pharmacies (i.e., Contract Pharmacies), and to allow 340B inventory to be dispensed through such Contract Pharmacies. *See* 61 Fed. Reg. at 43,549.

Initially, HRSA restricted 340B providers to contracting with only a single Contract Pharmacy. *Id.* at 43,551. In 2010, however, HRSA dramatically shifted the 340B Contract Pharmacy landscape by permitting 340B providers to maintain an unlimited number of Contract Pharmacy relationships. *See* 75 Fed. Reg. 10,272-01 (Mar. 5, 2010). In the wake of this HRSA guidance, for-profit pharmacies, especially

9

those owned or affiliated with PBMs, have seized on the opportunity to capitalize on substantial 340B drug discounts. The 2010 guidance opened the door for the largest and most sophisticated for-profit PBMs to realize substantial profits by looting a federal drug pricing program designed to aid non-profit 340B providers caring for the most resource-strapped and vulnerable patients.

**B. The Pharmacy Benefit Manager Landscape**

PBMs are fiscal intermediaries that administer and manage drug benefits on behalf of health insurance plans. PBMs are primarily responsible for processing and paying prescription drug claims submitted by providers on behalf of covered beneficiaries. The largest PBMs unilaterally dictate the provider's reimbursement for dispensing or administering the drug and the health plan will, in turn, reimburse the PBM for the amount paid to the provider.

The largest PBMs are owned or affiliated with the nation's largest health insurance companies. These PBMs also own or are affiliated with retail, mail-order and/or specialty pharmacies. As a result, a small number of huge, vertically integrated corporations wield near-limitless power and influence in the prescription drug market and the adjudication of 340B eligible claims. Today, three PBMs control nearly 80 percent of the prescription drug market: Caremark, ESI, and OptumRx.[8]

---

[8] Adam Fein ("Fein"), Drug Channels ("DC"), *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies—And What's Ahead,*

Each of these PBMs also share common ownership with a major insurer and specialty and/or mail-order pharmacy. Caremark is owned by CVS Health, which also owns health insurer Aetna[9] and CVS retail, mail order, and specialty pharmacies.[10] Health insurer Cigna owns ESI,[11] which operates its own mail-order pharmacy,[12] and Accredo Health, Inc., which operates Accredo Specialty Pharmacy.[13] Insurance company UnitedHealth Group owns OptumRx,[14] which owns OptumRx Specialty Pharmacy.[15]

## C. The Exponential Growth of Contract Pharmacies Has Caused Further Reliance on PBMs

Since 2010, the number of contract pharmacies participating in 340B and the number of arrangements these contract pharmacies maintain with 340B providers

---

(Apr. 9, 2024) https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html (last accessed June 20, 2025).

[9] https://www.aetnacvshealth.com/(last visited June 20, 2025); *see also* SilverScript, https://www.silverscript.com/, (last visited June 20, 2025).

[10] CVSHealth, Neighborhood Pharmacy, https://www.cvshealth.com/services/pharmacy/neighborhood-pharmacy.html (last visited June 20, 2025); CVSHealth, Specialty Pharmacy, https://www.cvshealth.com/services/pharmacy/specialty-pharmacy.html (last visited June 20, 2025).

[11] Bruce Japsen, *Cigna-Express Scripts Merger's A Done Deal*, Forbes, Dec. 19, 2018, https://www.forbes.com/sites/brucejapsen/2018/12/19/cigna-express-scripts-merger-a-done-deal-by-thursday/ (last accessed June 20, 2025).

[12] Express Scripts, https://www.express-scripts.com/rx (last accessed June 20, 2025).

[13] Accredo by Evernorth, https://www.accredo.com/ (last accessed June 20, 2025).

[14] Optum - About Us, https://www.optum.com/en/about-us.html (last accessed June 20, 2025).

[15] Optum, Specialty Pharmacy, https://www.optum.com/en/pharmacy-services/specialty-pharmacy.html, (last accessed June 20, 2025).

11

have grown exponentially. In January 2010, less than 1,300 locations participated as contract pharmacies.[16] However, by mid-2025, there were 32,069 locations for contract pharmacies participating in 340B—representing nearly 60% of all U.S. retail, mail, long-term care and specialty pharmacies—and accounting for 229,531 contractual relationships with 340B providers.[17] Between 2010 and 2020, the number of contract pharmacy arrangements with 340B providers grew by 4,228%,[18] with each 340B hospital utilizing 22 different contract pharmacies on average.[19]

This expansion has coincided with an *increasing* reliance on PBMs. In 2024, hospitals had approximately 83,000 total relationships with contract pharmacies, with the largest five companies accounting for approximately 75% of that total

---

[16] Fein, DC, *Exclusive: Five Pharmacy Chains and PBMs Dominate 2022's Still-Booming 340B Pharmacy Market*, https://www.drugchannels.net/2022/07/exclusive-five-pharmacies-and-pbms.html (last accessed June 20, 2025).

[17] Fein, DC, *The 340B Contract Pharmacy Market in 2025: Big Chains and PBMs Tighten Their Grip*, https://www.drugchannels.net/2025/06/340b-contract-pharmacy-market-in-2025.html (last accessed June 20, 2025).

[18] Aaron Vandervelde et al ("Vandervelde"), BRG, For-Profit Pharmacy Participation in 340B Program, at 4 (Oct. 2020), https://media.thinkbrg.com/wp-content/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf (last accessed June 20, 2025); *see also* AIR340B ("AIR340B"), *The Impact and Growth in 340B Contract Pharmacy Arrangements – Six Years Later*, at 1, https://340breport.com/wp-content/uploads/2024/05/AIR340B_340B-Contract-Pharmacies.pdf (last accessed June 20, 2025).

[19] Vandervelde, at 7.

figure.[20] Those companies—CVS Health, Walgreens, Walmart, Express Scripts (Cigna) and OptumRx (UnitedHealth)—include or are affiliated with the largest PBMs. Between just 2020 and 2025, the three largest PBMs dramatically increased the number of PBM-affiliated contract pharmacy relationships—for CVS/Caremark from approximately 23,000 to 77,000, for ESI/Cigna from approximately 6,000 to 15,000, and for OptumRx/UnitedHealth from approximately 3,000 to 13,000.[21]

The mutation of 340B places an enormous amount of the national drug spend in the hands of for-profit PBMs. Approximately 14% of all pharmaceutical sales in the United States, or $124 billion, are accounted for under 340B.[22] 340B has grown three times faster than the non-340B drug market between 2018 and 2023.[23] Between 2022 and 2023, 340B expenditures increased more than 23%—a rate of increase that has been largely consistent over the past several years.[24] In terms of magnitude, 340B

---

[20] Fein, DC, *Hospitals are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis*, https://www.drugchannels.net/2024/06/hospitals-are-relying-more-on-pbms-to.html (last accessed June 20, 2025).

[21] Fein, DC, *The 340B Contract Pharmacy Market in 2025: Big Chains and PBMs Tighten Their Grip*, https://www.drugchannels.net/2025/06/340b-contract-pharmacy-market-in-2025.html (last accessed June 20, 2025).

[22] Rory Martin and Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023*, https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2024/iqvia-update-on-size-of-340b-program-report-2024.pdf (last accessed June 20, 2025).

[23] *Id*.

[24] Fein, DC, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, https://www.drugchannels.net/2024/10/the-340b-program-reached-66-billion-

has exceeded the size of Medicare Part D, which spent approximately $116 billion on drug expenditures in 2023.[25] The primary component driving 340B's tremendous expansion is not a rise in the number of 340B eligible patients or increased need for charity care, but rather the expansive use of contract pharmacies, the vast majority of which are PBM-owned or affiliated.

### D. The High Cost of Paying off Vertical Integration and the Resulting Harm to Low-Income Patients and Independent Community Practices

The exponential growth of contract pharmacies, on its own, would not be an issue if it resulted in increased access and affordability of care to patients of 340B providers. But financial help for patients is "*negatively correlated*" with growth of contract pharmacies.[26] The "growth of contracts with 340B hospitals [is] uncorrelated with uninsured rates, poverty rates, or areas of medical underservice."[27] In direct contradiction to the spirit of 340B—serving poor neighborhoods and

---

in.html (last accessed June 20, 2025); *see also* Fein, DC, *Exclusive: The 340B Program Soared to $38 Billion in 2020 – Up 27% vs 2019*, https://www.drugchannels.net/2021/06/exclusive-340b-program-soared-to-38.html (last accessed June 20, 2025).

[25] Congressional Budget Office, Medicare Baseline Projections, https://www.cbo.gov/system/files/2024-06/51302-2024-06-medicare.pdf (last accessed June 20, 2025).

[26] Bruce Levinson, *Measuring the Effectiveness of the 340B Program*, at 4, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3284078 (last accessed June 20, 2025).

[27] Sayeh Nikpay et al., *Association of 340B Contract Pharmacy Growth With County-Level Characteristics*, American Journal of Managed Care, https://www.ajmc.com/view/association-of-340b-contract-pharmacy-growth-with-county-level-characteristics (last accessed June 20, 2025).

14

patients—following HRSA's reversal of its one-contract-pharmacy policy, "the percent of 340B pharmacies in the *lowest* income neighborhoods *declined by 5.6%*."[28] Conversely, "the percentage of 340B pharmacies in the *highest* income neighborhoods *increased by 5.0%*."[29] Contract pharmacy growth has therefore been concentrated in affluent neighborhoods, with predominately fully insured patients.[30] For example, a May 2024 report by the North Carolina State Treasurer found that despite the marked expansion of contract pharmacies, jumping from six within North Carolina in 2010 to 1,059 in 2022, it primarily involved an expansion into **wealthier** neighborhoods, serving communities that were 41.5% more affluent than in 2012.[31] Further, between 2010 and 2020, the distance between hospital 340B providers and their contract pharmacies has increased dramatically, from an average of 34 miles to

---

[28] Dr. John K. Lin, et al., *Assessment of US Pharmacies Contracted With Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Status*, JAMA, (June 17, 2022), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2793530 (last accessed June 20, 2025).

[29] *Id.* (suggesting that economic opportunity cannot justify the disparity in the decline of 340B Contract Pharmacies in poor neighborhood because "the percentage of non-340B pharmacies in the same neighborhood *increased* by 1.3%").

[30] Ted Okon, STAT, *Hospitals and for-profit PBMs are diverting billions in 340B savings from patients in need*, (July 7, 2022), https://www.statnews.com/2022/07/07/for-profit-pbms-diverting-billions-340b-savings/

[31] State Treasurer of North Carolina, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program;* https://www.shpnc.org/documents/overcharged-state-employees-cancer-drugs-and-340b-drug-price-program/download?attachment

an average of 334 miles.[32]  In some instances, a contract pharmacy can be in a different state thousands of miles away from the 340B provider.[33]

Another collateral consequence of the rapid expansion of Contract Pharmacy relationships with 340B providers is that independent community practices and pharmacies, such as COA members, are being crowded out of the market.[34] This phenomenon is likely attributable to the PBMs' exclusionary tactics against independent and unaffiliated providers and the imposition of oppressive and unreasonable terms of participation in the PBMs' pharmacy networks.

## ARGUMENTS

### A. The Lack of Regulation Regarding the Exponential Growth of Contract Pharmacies Has Allowed PBMs to Siphon the 340B Profits Intended for Charity Care

"The enormous growth in 340B contract pharmacy arrangements seems to boil down to a *single* factor: *outsized profit margins*."[35]  A lack of regulation over the growth and use of PBM-affiliated contract pharmacies has allowed for-profit corporations to exploit 340B and divert the financial benefits intended for patients

---

[32] Vandervelde, at 7.

[33] *Id.* at 4.

[34] *See*, *e.g.*, . Nikpay, Sayeh S., et al., *Hospital-Physician Consolidation Accelerated in the Past Decade in Cardiology, Oncology,* Health Affairs. July 2018. https://www.healthaffairs.org/doi/10.1377/hlthaff.2017.1520 (last accessed June 20, 2025).

[35] Vandervelde at 4 (emphasis added).

16

in need and the 340B providers that serve them.[36] In turn, this means that the exponential growth of contract pharmacies has not translated into increased financial assistance for patients in need. Instead, it has served to create a new, lucrative source of profits for large corporations.

Indeed, based on the terms of their contracts with 340B providers, contract pharmacies retain a substantial portion, generally 25-35%, of total 340B discounts,[37] but there is no requirement that contract pharmacies use those discounts to help patients.[38] Typically, 340B providers pay the contract pharmacy a flat fee for each eligible prescription dispensed, which generally ranges from $6-$15, but can be upwards of $1,750 per prescription.[39] Additionally, some 340B providers "also agree[] to pay [contract] pharmacies a percentage of the revenue generated by each

---

[36] PhRMA, PR Newswire, *New Analysis Shows Contract Pharmacies Financially Gain From 340B Program With No Clear Benefit to Patients*, https://www.prnewswire.com/news-releases/new-analysis-shows-contract-pharmacies-financially-gain-from-340b-program-with-no-clear-benefit-to-patients-301148590.html.

[37] Fein, DC, *Exclusive: Five Pharmacy Chains and PBMs Dominate 2022's Still-Booming Contract Pharmacy Market*, https://www.drugchannels.net/2022/07/exclusive-five-pharmacies-and-pbms.html (last accessed June 20, 2025); *see also* Minnesota Department of Health. *340B Covered Entity Report: Report to the Legislature*, https://www.health.state.mn.us/data/340b/docs/2024report.pdf (last accessed Feb. 6, 2025).

[38] GAO, GAO-18-840, *Drug Discounts in the 340B Program Offer Benefits, But Federal Oversight Needs Improvement*, (June 2018), at 31, https://bit.ly/3vKXcxg ("GAO 2018") (noting that 57% of surveyed hospital-CEs provided *no 340B discounts* to patients receiving their prescriptions at Contract Pharmacies).

[39] *Id.* at 26.

[340B] prescription," which can be as much as 20%.[40] With these favorable reimbursements, the average profit margin for contract pharmacies on 340B claims for brand name drugs is an astounding 72%, compared with just 22% for non-340B brand name drug claims.[41] Put another way, a contract pharmacy's profit margin is approximately three times greater for 340B brand name claims than for non-340B.

### 1. PBM-Affiliated Pharmacies Comprise a Disproportionate Share of Contract Pharmacies and Retain Billions in 340B Discounts Annually

The contract pharmacies participating in 340B are primarily not independent pharmacies. Rather, the vast majority of contract pharmacy arrangements are between covered entities and large for-profit pharmacies that are owned by or affiliated with the largest PBMs.[42] These integrated corporations, especially over the last five to ten years, have grown to own a significant majority of contract pharmacy relationships.[43] As of mid-2025, the top five companies, including the largest PBMs

---

[40] *Id.*

[41] Vandervelde, at 4.

[42] Karen Mulligan, PhD, University of Southern California, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments*, (Oct. 14, 2021) at 4, https://schaeffer.usc.edu/wp-content/uploads/2024/10/USC_Schaeffer_340BDrugPricingProgram_WhitePaper.pdf (noting that "[l]arge retail pharmacy chains—Walgreens, CVS, Walmart, and Rite Aid are disproportionately represented among contract pharmacies") (last accessed June 20, 2025); *see also* GAO 2018, at 20; (noting 75% of CP arrangements are held by "chain pharmacies").

[43] Fein, DC, *Hospitals Are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis*,

18

(Caremark, ESI, and OptumRx) and pharmacy giants Walgreens and Walmart control 76.1% of all contract pharmacy relationships through their owned or affiliated contract pharmacies.[44] Each of these entities operate or are affiliated with a PBM.[45] Additionally, more than 90% of Walgreens and CVS Health locations serve as contract pharmacies.[46] In fact, CVS Health is the largest contract pharmacy participant in the 340B Program, with an estimated 77,000 contract pharmacy relationships, out of nearly 230,000 nationally.[47]

In addition to their retail pharmacies, Caremark, ESI, and OptumRx collectively own 500 mail order, specialty, and infusion pharmacies that act as contract pharmacies.[48] Demonstrating the outsized control the PBMs have over the overall 340B contract pharmacy market, these 500 contract pharmacies have a

---

https://www.drugchannels.net/2024/06/hospitals-are-relying-more-on-pbms-to.html (last accessed June 20, 2025).

[44] Fein, DC, *The 340B Contract Pharmacy Market in 2025: Big Chains and PBMs Tighten Their Grip*, https://www.drugchannels.net/2025/06/340b-contract-pharmacy-market-in-2025.html (last accessed June 20, 2025); *see also* GAO 2018, at 20-21 (noting approximately 75% of 340B Contract Pharmacies are chain pharmacies, notwithstanding that chain pharmacies represent scarcely half of all pharmacies nationwide).

[45] *See* https://ncpa.org/sites/default/files/2024-05/VerticalBusiness_2024_040324.pdf (last accessed June 20, 2025).

[46] *Id*.

[47] *Id*.

[48] Fein, DC, *Exclusive: Five Pharmacy Chains and PBMs Dominate 2022's Still Booming Contract Pharmacy Market*, https://www.drugchannels.net/2022/07/exclusive-five-pharmacies-and-pbms.html (last accessed June 20, 2025).

combined 35,000 contractual arrangements with 340B providers.[49] These 500 mail, specialty, and infusion pharmacies owned by or affiliated with the three largest PBMs account for only 1.5% of all contract pharmacy *locations*, but 21% of the total number of contract pharmacy *relationships*.[50]

The rapid rise of contract pharmacies may be explained, in part, by the large PBMs' use of their enormous, outsized market leverage and discriminatory practices to pressure covered entities, including those that have their own in-house pharmacies, to use PBM-affiliated contract pharmacies. For example, some PBMs have implemented practices termed "discriminatory reimbursement" against contract pharmacies owned by 340B providers, or have outright excluded them from the PBMs' networks.[51] The top PBMs also make aggressive offers to become contract pharmacies for the excluded 340B providers and steer their patients to a PBM-affiliated contract pharmacy, in order to maximize 340B profits.

The above contract pharmacy relationships translate to substantial profits from 340B for the PBMs' parent conglomerates. In 2023, CVS Health contract pharmacies retained $1.08 billion of 340B drug discounts; Walgreens contract

---

[49] *Id.*

[50] *Id.*

[51]    Jeffrey Lewis et al, *PBMs and the 340B Program*, https://static1.squarespace.com/static/606bf3eddab8ab30cd7da482/t/617b07d2a5a1 4330918123bc/1635452883440/PBMs+and+340B+White+Paper+June+29+2021+ %281%29.pdf (last accessed June 20, 2025).

pharmacies retained $1.04 billion; ESI contract pharmacies retained $663 million; and OptumRx contract pharmacies retained $337 million.[52] Collectively, in 2023, Walgreens, Caremark, ESI, and OptumRx retained $3.12 billion in 340B discounts. These corporations are likely retaining these discounts as very close to pure profit, considering the 340B provider supplies 340B drugs at essentially no cost to the contract pharmacy.

### 2. PBMs and Contract Pharmacies Have Indicated that Reductions to Their 340B Contract Pharmacy Footprint Would Significantly and Materially Affect Overall Profitability

340B has become a significant profit center of for-profit corporations owning PBMs and contract pharmacies. The annual reports of CVS Health and Walgreens Boots Alliance confirm that 340B profits are material to their business operations and warn that restrictive contract pharmacy policies enacted by drug manufacturers, such as AstraZeneca, will negatively impact their bottom lines. *See e.g.*, CVS Health Corporation, Form 10-K FY 2021, p. 22-23 ("[a] reduction in 'Covered Entities' participation in contract pharmacy arrangements, as a result of the pending enforcement actions or otherwise, a reduction in the use of [CVS/Caremark's] administrative services by Covered Entities, or a reduction in drug manufacturers'

---

[52] Nephron Research, *340B Pharmacy Tailwind/Manufacturer Headwind Poised to Reverse in 2H 2023*, https://nephronresearch.com/340b-pharmacy-tailwind-manufacturer-headwind-poised-to-reverse-in-2h-2023/ (last accessed June 20, 2025).

participation in the program could materially and adversely affect [CVS/Caremark]"; WBA, Form 10-K FY 2021, p. 22 ("[c]hanges in pharmaceutical manufacturers' pricing or distribution policies and practices as well as applicable government regulations, including, for example, in connection with the federal 340B drug pricing program, could also significantly reduce [WBA's] profitability."). Clearly, with the huge increase in contract pharmacies, 340B has mutated away from Congress' original intention of serving communities and patients in need to increasing profits for large corporations.

**B. The Profit Opportunities Presented by 340B and Contract Pharmacies Have Incentivized PBMs to Drive Out Unaffiliated Providers to the Detriment of Patients**

The substantial profit opportunities for PBM-affiliated contract pharmacies have further spurred PBM attempts to divert patient volume to their own affiliated contract pharmacies and drive unaffiliated contract pharmacies out of the market. PBMs have engaged in exclusionary tactics against unaffiliated providers participating in 340B; and for those unaffiliated providers able to obtain admission to these restrictive networks, PBMs actively seek to divert as much patient volume to their owned or affiliated contract pharmacies.

PBMs employ restrictive networks and overly burdensome admission requirements. In the specialty and mail order markets, PBMs have created both exclusive and near-exclusive networks whereby all PBM affiliated pharmacies are

able to participate, but virtually no other pharmacy is permitted access.[53] Indeed, some PBM networks are effectively closed to any pharmacy unaffiliated with PBMs.[54] As discussed above, specialty and mail order prescriptions account for a significant portion of 340B claims revenue. This has become dominated by PBMs, which have made their specialty network application and approval process intentionally onerous, blocking admission to pharmacies failing to meet the PBMs' self-created and unachievable admission criteria.[55] For example, when PBMs deny unaffiliated pharmacy applications, they often require them to wait a year or more before they can reapply. PBMs also require applying pharmacies to demonstrate a broad level of expertise in dispensing a wide range of specialty medications in

---

[53] Fein, DC, *Independents Outshine PBMs in Manufacturers' Exclusive Specialty Pharmacy Networks*, https://www.drugchannels.net/2024/04/independents-outshine-pbms-in.html (last accessed June 20, 2025)*; see also* Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers and Taxpayers*, (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf (last accessed June 20, 2025).

[54] *Id.*

[55] Jeffrey Lewis et al, *PBMs and the 340B Program*, https://static1.squarespace.com/static/606bf3eddab8ab30cd7da482/t/617b07d2a5a1 4330918123bc/1635452883440/PBMs+and+340B+White+Paper+June+29+2021+ %281%29.pdf (last accessed June 20, 2025).; Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers and Taxpayers*, (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf (last accessed June 20, 2025).

23

numerous therapeutic classes.[56] In sum, the PBMs have created a sham application and admission process that, in all practicality, only allows PBM-affiliated pharmacies to participate.

### C. PBMs Exploit the Lack of Transparent Data about 340B Claims to Obtain Illegal Double Discounts on Already-Discounted 340B Drugs

The lack of transparent data-sharing between 340B providers, Contract Pharmacies, and drug manufacturers as to which claims are 340B-eligible or which drugs dispensed to patients were obtained at the 340B-discounted price, creates opportunity for "rebate aggregators" or "group purchasing organizations" ("GPOs") to profit at the expense of drug manufacturers. Each of the big three PBMs (Caremark, Express Scripts, and OptumRx) have established separate rebate aggregators or GPOs, which are affiliated entities that provide rebate contracting services on behalf of the PBMs and the PBMs' clients. Rebate aggregators and GPOs include Ascent Health Services (affiliated with Express Scripts and Prime, and also serving Humana Pharmacy Solutions), Zinc Health Services (affiliated with CVS), and Emisar Pharma Services (affiliated with OptumRx). They are essentially extra middlemen between drug manufacturers and PBMs, and allow the latter to

---

[56] *Id.*

dramatically obscure the flow of prescription drug money, in turn opaquely taking a contingent fee cut of rebates negotiated.[57]

Drug manufacturers' rebate contracts generally exempt 340B claims.[58] However, the PBMs and their affiliated rebate aggregators earn fees on the rebates paid by drug manufacturers, specifically, as a portion of drug cost eligible for rebates.[59] In turn, PBMs have a direct financial incentive to conceal which claims are 340B to drug manufacturers, which may result in the payment of duplicate drug manufacturer rebates on already-discounted 340B drugs. At the same time, when facing healthcare plans and plan sponsors to which the rebates are owed, the PBMs are likely asserting that the same drug claims are in fact 340B and thus exempt from rebate guarantees to the plans.[60] This is a win-win situation for the PBMs and affiliated intermediaries: they earn lucrative fees on the duplicative rebates paid by

---

[57] *See* Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, July 2024, https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf (last accessed June 20, 2025).

[58] Medicaid plans are also statutorily precluded from claiming duplicate Medicaid drug rebates on 340B claims. *See* 42 U.S.C. § 256b(a)(5)(A)(i).

[59] Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, July 2024, https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf, at 22.

[60] *See* National Alliance of Healthcare Purchaser Coalitions, *A Playbook for Employers: Addressing Pharmacy Benefit Management Misalignment*, https://www.nationalalliancehealth.org/wp-content/uploads/NationalAlliance_PBM_PB_2023_A.pdf at 15 (last accessed June 20, 2025).

drug manufacturers, but those rebates are also not being passed along to plans, which may ultimately increase the insurance premiums and out-of-pocket costs paid by consumers.[61]

### D. The Cash Rebate Model Improves Upon the Status Quo Through Greater Transparency

To recap, the 340B Program has been transformed from a non-profit community benefit into a massive financial boon for the largest for-profit PBMs and their affiliates. Although there is no single "fix" to address the problems identified in this *amicus* brief, COA supports Novartis' and BMS' adoption of the cash rebate model because it will immediately inject transparency into a system that is currently operating as a black box. The Contract Pharmacies do not know when a customer is a patient of a 340B provider or if they are 340B-eligible. The manufacturer also does not know when a 340B drug has been dispensed, or which claims being included in a PBM's request for rebates were purchased under the 340B program, rendering them ineligible for rebates. Due to the lack of transparency, all the entities in this chain, including the 340B providers, rely heavily on Contract Pharmacies and TPAs to faithfully execute the requirements and obligations of 340B—even when the Contract Pharmacies and TPAs are for-profit entities whose goal is not necessarily

---

[61] Luke Greenwalt, IQVIA, *Uncover the Invisible Impacts of 340B Discounts*, Dec. 20, 2021, https://www.iqvia.com/locations/united-states/blogs/2021/12/uncover-the-invisible-impacts-of-340b-discounts (last accessed June 20, 2025).

26

to ensure full compliance with all 340B Program rules and regulations. The product replenishment model, as it is implemented today, enables PBMs to exploit the 340B Program because there is no accountability for profit-seeking and unscrupulous middlemen who have no interest in upholding the original design of 340B and no qualms about skimming as much as possible from the 340B savings that Congress originally intended. HRSA needs to understand that the current model of 340B is a far cry from Congress's original intent for the program.

The cash rebate model proposed by Appellants Novartis and BMS would improve the *status quo* on at least three fronts. First, no 340B discounts would be realized by the 340B providers until they demonstrate, through readily-available data that the claims are 340B-eligible claims—this also will demand less reliance on TPAs. Second, 340B providers will be able to better track how much of the 340B savings are being diverted and retained by intermediaries, such as TPAs and Contract Pharmacies. Third, by clearly identifying to the drug manufacturer which claims are 340B, duplicate discounts (either on drug manufacturer rebates or Medicaid rebates) will be eliminated. Although the cash rebate model is unlikely to be a panacea for the PBMs' mass profiteering from the 340B program, it will be an important first step in alleviating some of the conditions that allow PBMs to profit off the 340B Program, with the impact of crowding out patients in need who are the intended beneficiaries of the 340B Program.

27

## CONCLUSION

Given the unregulated and unchecked growth of for-profit Contract Pharmacies, TPAs, and PBMs participating in 340B, and the mounting evidence that these entities are exploiting the lack of transparency in 340B claims data to retain substantial portions of 340B drug discounts, *amicus* Community Oncology Alliance, Inc. supports Plaintiffs-Appellants Novartis and BMS in this appeal and respectfully urges the Court to reverse the District Court's May 15, 2025 Order denying Novartis' and BMS' motions for summary judgment and granting the government's cross-motions for summary judgment.

Dated: July 7, 2025                              Respectfully submitted,

                                                 */s/ Matthew J. Modafferi*
                                                 Matthew J. Modafferi, Esq.
                                                 Jonathan E. Levitt, Esq.
                                                 **FRIER & LEVITT, LLC**
                                                 84 Bloomfield Avenue
                                                 Pine Brook, NJ  07058
                                                 (973) 618-1660
                                                 mmodafferi@frierlevitt.com
                                                 jlevitt@frierlevitt.com

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,065 words.

2. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

*/s/ Matthew J. Modafferi*

29

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 7th day of July, 2025, he electronically

filed the foregoing with the Clerk of Court using the CM/ECF system, which

automatically sent a notice of electronic filing to all counsel of record.

*/s/ Matthew J. Modafferi*